IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Philadelphia Parking Authority,   :
              Petitioner   :
                              :
            v.               :
                              :
Unemployment Compensation   :
Board of Review,                 :   No. 116 C.D. 2023
            Respondent   :   Argued: November 9, 2023

BEFORE:   HONORABLE CHRISTINE FIZZANO CANNON, Judge
              HONORABLE ELLEN CEISLER, Judge
              HONORABLE LORI A. DUMAS, Judge

OPINION
BY JUDGE FIZZANO CANNON               FILED: January 17, 2024

The Philadelphia Parking Authority (PPA) petitions for review of the January 11, 2023, decision and order of the Unemployment Compensation Board of Review (Board), which granted unemployment compensation benefits to Terrence Arthur (Claimant). Upon review, we affirm.

## I. Factual & Procedural Background

On October 29, 2020, Claimant filed an online application for unemployment benefits. Certified Record (C.R.) at 14. He stated that he began working full time for PPA in February 2015 and was working as a deputy manager of operations when he was terminated by PPA on October 25, 2020, for violating a rule or policy; he disputed that reason. *Id*. at 15-17. PPA contested Claimant's

application and attached the termination letter it sent to Claimant. *Id.* at 25-26. The letter stated that PPA received an email complaint from a parking patron regarding an incident on October 23, 2020, at PPA's Philadelphia airport parking facility. *Id.* at 26. The patron claimed that Claimant had intimidated and refused to allow her to leave after a dispute over her payment. *Id.* PPA stated in the letter that it investigated the incident and found the patron's claim substantiated; it also described a past pattern of similar behavior by Claimant. *Id.* The letter informed Claimant that his conduct during the incident violated PPA policy and, combined with his past issues, could not be tolerated by PPA; therefore, his employment was terminated, effective immediately. *Id.*

On April 8, 2021, the Office of Unemployment Compensation Benefits issued an initial notice of determination denying Claimant's application. C.R. at 35. The determination stated that PPA had provided information establishing that Claimant's termination was due to his willful misconduct; therefore, he was ineligible for benefits. *Id.* Claimant appealed and asserted that the patron incorrectly believed she was entitled to a lower parking rate than she was charged and that he had not violated any PPA rules.[1] *Id.* at 44. Claimant averred that the patron refused to pay the charged amount and the dispute escalated to the point where Claimant called the airport police. *Id.* at 45. According to Claimant's appeal, the police were able to explain the policy to the patron and she ultimately paid the full amount due. *Id.*

---

[1] According to Claimant's appeal, PPA instituted a discount on parking if the patron's car was parked for 72 hours or longer. Certified Record (C.R.) at 44. However, the advertisements stated that the discount was available for parking "3 days or more," which led to patron confusion and arguments if their cars were parked over the course of 3 calendar days but for less than 72 hours, in which case they were not eligible for the discount. *Id.*

Based on Claimant's appeal, the Board issued a notice scheduling a telephone hearing before a referee on May 19, 2021, which was subsequently continued to June 21, 2021. C.R. at 51, 75 & 96. On Claimant's request, subpoenas were issued to David Tribuiani (Tribuiani) and Kevin Abara, co-workers who both witnessed the incident, and to Jean Claude Kadima Lukusa, Claimant's shop steward, who could speak to Claimant's work history and to the incident that led to Claimant's termination. *Id.* at 64 & 94-99.

At the June 21, 2021, telephone hearing, the referee stated on the record that PPA's hearing notice had not been returned as undelivered, but PPA did not answer the referee's phone call and therefore did not participate in the hearing. C.R. at 102. Consistent with his written appeal, Claimant testified that the dispute with the patron began when she disagreed with the charge for her parking and maintained that he had not violated any PPA rules or policies and had not acted with willful misconduct. *Id.* at 107-08.

Tribuiani participated in the hearing.[2] He recalled that the patron disputed her parking charge, refused to pay, and, as Claimant averred, did not understand why she was not entitled to the discounted rate. C.R. at 108-09. Tribuiani stated that Claimant tried to explain to the patron why the discounted rate was not available to her and that it could not be changed to give her the discount. *Id.* at 109. Tribuiani added that Claimant also tried to explain to the patron PPA's procedure for when a patron has insufficient funds to pay their parking charge, which is that they can pay partially or not at all but must promise to pay within five business days. *Id.* Tribuiani recalled that after Claimant called the airport police, the patron ultimately paid the full amount of her charge with a credit card. *Id.* at 110. Tribuiani

_____

[2] Claimant advised on the record that Jean Claude Kadima Lukusa could not participate due to a death in his family and the referee was unable to reach Kevin Abara. C.R. at 102-03.

3

stated that based on his observation of the incident, Claimant had not violated any policies or engaged in willful misconduct. *Id.*

On June 23, 2021, the referee issued a decision and order reversing the original denial and granting Claimant benefits. C.R. at 125. The referee found Claimant's testimony to be credible and concluded that PPA, which had not participated in the hearing, had not met its burden to show that Claimant acted with willful misconduct so as to bar him from receiving benefits. *Id.* at 123. The referee specifically found as fact that, based on the hearing evidence and testimony, Claimant worked to the best of his ability, did not knowingly violate PPA rules, and met or exceeded PPA performance standards. *Id.*

PPA appealed, explaining that while it received notice of the May 19th hearing, it had not received notice of the rescheduled June 21st hearing. C.R. at 146. On October 6, 2021, the Board issued an order that another hearing would be scheduled for PPA to show good cause why it did not participate in the June hearing. *Id.* at 156. The order stated the parties could also present additional evidence on the underlying merits and that if PPA showed good cause for its failure to appear and participate in the June hearing, its merits evidence would be considered by the Board. *Id.* at 156-57.

The second telephone hearing took place on October 19, 2021, before the same referee as the June hearing. *Id.* at 162. The referee could not reach Claimant, but PPA appeared and participated. *Id.* at 177. The referee stated that she would not be issuing a second opinion after the hearing and that the matter would return directly to the Board for final determination "after its consideration of the entire record." *Id.* at 179. PPA's counsel objected to inclusion in the record of the June hearing transcript because PPA did not have the opportunity to cross-examine

4

Claimant and asked that the Board give no weight to Claimant's testimony if it was included in the record before the Board. *Id*. at 181 & 191. The referee noted PPA's objection for the record and overruled it, explaining that a challenge to the weight of a witness's testimony was not a basis for exclusion of that testimony. *Id*. at 181.

Pamela Evans (Evans), the manager of parking operations for PPA at its airport location, testified for PPA. She and PPA counsel both stated that PPA did not participate in the June hearing because it never received the notice for that proceeding. C.R. at 182. Evans stated that Claimant's employment was terminated because PPA believed that during the October 2020 incident, he violated its procedure for when a patron has insufficient funds to pay their parking charge; the proper approach is to provide the patron with information and a "promise to pay" letter so they can pay their charge within five business days. *Id*. at 183 & 188. Evans averred that Claimant was aware of the policy. *Id*. She personally called the patron and got the patron's version of the incident. *Id*. She then interviewed Claimant and Tribuiani separately by phone. *Id*. at 184. She also viewed security video footage of the incident although it did not have sound. *Id*. at 185. Joseph Bashetti, an administrative manager, helped with the investigation although he had not been present at the incident. *Id*. at 184. Evans stated that she believed the patron's version of the story and concluded that if Claimant had simply given the patron the insufficient funds information in the first place, the entire incident would never have escalated as it did. *Id*. at 184 & 189.

The patron's complaint was made part of the record and Evans read through it as part of her testimony. Reproduced Record (R.R.) at 45a-46a; C.R. at 186. In the email, the patron stated that she believed she was entitled to the discount posted at PPA's airport parking facility and when she was charged the full price by

the machine, she did not have enough money. R.R. at 45a-46a. She did not understand why she should be charged the full price when she was parked there over the course of three days. *Id*. She believed she was being scammed. *Id*. After she was unable to resolve the matter with the first attendant, Claimant was called to the scene and was "very difficult" and "forceful" with her. *Id*. She asked him what could be done if she did not have enough money and he responded that the problem was that she did not want to pay, not that she didn't have enough money. *Id*. at 46a. She averred that Claimant would not let her leave until the airport police arrived. *Id*. She believed Claimant was abusing his power and discriminating against her as a woman and she stated that she would be posting what happened on social media platforms. *Id*.

Evans also testified about and added to the record an email Claimant sent her after their phone interview about the incident in which he described her conduct during the interview as hostile and disrespectful; she forwarded that email to PPA's Human Resources (HR) department. C.R. at 187-88. Evans also testified about Claimant's most recent performance evaluation, which she conducted and wrote roughly one month before the incident, and which was made part of the record. *Id*. at 189a; R.R. at 47a-51a. The evaluation stated that Claimant had been counseled previously about his interactions with patrons and other staff and that this was an area for improvement on his part. R.R. at 49a. However, it also stated that despite Claimant's interpersonal shortcomings, his work was satisfactory and that he "is diligent in his efforts of enforcing policies and procedures of [PPA]." *Id*. at 49a. Evans also acknowledged that she did not personally have a role in Claimant's termination; she reported her findings to HR, which conducted further investigation and ultimately terminated Claimant as of October 25, 2020. C.R. at 185 & 190-91.

6

On January 11, 2023, the Board issued its final determination. C.R. at 193-94. The Board first concluded that PPA established good cause for its absence at the June 2021 hearing and that its merits evidence would be considered. *Id*. at 193. However, based on the "entire record," the Board concluded that PPA had not met its burden to show that Claimant had been legitimately terminated for willful misconduct. *Id*. at 194. Specifically, the Board characterized Evans's testimony as hearsay because she admittedly was not present at the incident or involved in the termination decision. *Id*. The Board also adopted and incorporated the referee's June 2021 decision, adding only to the findings of fact that, based on the evidence from the October 2021 hearing, Employer had established that it terminated Claimant for his purported violation of the policy regarding patrons with insufficient funds. *Id*. at 193. PPA appealed to this Court.[3]

## II. Issues

First, PPA asserts that the Board erred in considering Claimant's testimony from the June 2021 hearing because PPA had no opportunity to cross-examine him, therefore, it was prejudiced and sustained a procedural due process violation. PPA's Br. at 1.[4] Next, PPA argues that the Board's determination that

---

[3] Claimant has not participated in this appeal; UCBR is the active respondent and interested party pursuant to Pennsylvania Rule of Appellate Procedure 1513(a) ("In an appellate jurisdiction petition for review, the aggrieved party or person shall be named as the petitioner. Unless the government unit is disinterested, the government unit and no one else shall be named as the respondent.").

[4] Our review of the Board's order "is limited to determining whether the necessary findings of fact were supported by substantial evidence, whether errors of law were committed, or whether constitutional rights were violated." *Begovic v. Unemployment Comp. Bd. of Rev.*, 234 A.3d 921, 929 n.6 (Pa. Cmwlth. 2020).

7

PPA did not meet its burden of proof to establish Claimant violated PPA policies and engaged in willful misconduct was not supported by substantial evidence of record. *Id*. at 2.

### A. Board's Consideration of Claimant's Evidence: Due Process

Procedural due process is necessary in administrative hearings and requires notice and an opportunity to present evidence and legal argument, including cross-examination of the other side's witnesses. *Massie v. Unemployment Comp. Bd. of Rev.*, 255 A.3d 702, 708 (Pa. Cmwlth. 2021); *Henderson v. Unemployment Comp. Bd. of Rev.*, 77 A.3d 699, 715 (Pa. Cmwlth. 2013). Regulations allow unemployment proceedings to be held in the absence of a party, but also allow that party to petition for reopening of the record upon a showing of good cause for the absence. *Massie*, 255 A.3d at 708 (citing 34 Pa. Code §§ 101.24(a), (c) & 101.51). In that case, the regulations stated that the referee "shall serve as a hearing officer for the Board, to receive from the parties the additional information as may be pertinent and material to a proper conclusion in the case." 34 Pa. Code § 101.104(d). "After the record has been completed, the entire file and record of evidence shall be returned to the Board for its consideration and the further action as may be deemed appropriate." *Id*. The Board is the ultimate finder of fact and may accept or reject the testimony of any witness; questions regarding the weight of evidence and witness credibility are solely within its province. *Morgan v. Unemployment Comp. Bd. of Rev.*, 108 A.3d 181, 188 (Pa. Cmwlth. 2015).

In this context, a remand generally functions as a proceeding for the gathering of additional evidence rather than a *de novo* or *nunc pro tunc* proceeding. In fact, the regulation that permits the subsequent proceeding when a party is absent

from an initial proceeding is titled "Reopening of hearing." 34 Pa. Code § 101.24. As noted, the regulations state that after the record has been completed with additional evidence from a second hearing, "the *entire file and record of evidence* shall be returned to the Board for its consideration and the further action as may be deemed appropriate." 34 Pa. Code § 101.104(d) (emphasis added). Section 504 of the Unemployment Compensation Law[5] (UC Law) states that when a matter is before the Board on appeal from a referee's determination, the Board "may affirm, modify, or reverse the [referee's determination] on the basis of the evidence previously submitted in the case, or direct the taking of additional evidence." 43 P.S. § 824.

This Court has held that the Board has significant latitude when directing a remand proceeding, and the regulations do not require that such a proceeding be *de novo* or on a *nunc pro tunc* basis. *Stop-N-Go of W. Pa., Inc. v. Unemployment Comp. Bd. of Rev.*, 707 A.2d 560, 564 (Pa. Cmwlth. 1998); *see also Milewski v. Unemployment Comp. Bd. of Rev.* (Pa. Cmwlth., No. 2059 C.D. 2012, filed May 23, 2013), slip op. at 5-6, 2013 WL 3156580, at \*3 (unreported) (holding that the claimant was "mistaken in asserting that the [r]emand [h]earing would have to be conducted *de novo* and all testimony adduced at the [f]irst [h]earing be ignored by the Board" and that the claimant did not sustain a due process violation because he ultimately received a full and fair opportunity to be heard, subpoena witnesses, and cross examine the employer's witnesses).[6]

---

[5] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, as amended, 43 P.S. §§ 751-919.10.

[6] We cite this unpublished decision as persuasive authority pursuant to Section 414(a) of our Internal Operating Procedures. 210 Pa. Code § 69.414(a).

In unemployment proceedings, "[t]he issuance of subpoenas to compel the attendance of witnesses . . . may be obtained on application to the Board, referee, or at any local employment office." 34 Pa. Code § 101.31. If a party believes a particular witness's testimony is germane, then that party bears responsibility for ensuring the witness's attendance via subpoena. *Schneider v. Unemployment Comp. Bd. of Rev.*, 12 A.3d 754, 758 (Pa. Cmwlth. 2010). This Court has held that subpoena requests are the duty of the parties and that unemployment adjudicators may not issue subpoenas *sua sponte* in the absence of a party's request. *Farmland Indus., Inc. v. Unemployment Comp. Bd. of Rev.*, 478 A.2d 524, 526 (Pa. Cmwlth. 1984) (declining to impose "an affirmative duty on the referee to subpoena witnesses absent a timely application by a proper party to the controversy[.]"). We have also held that a party's failure to subpoena witnesses, including the claimant who is a party to the matter, will preclude that party from claiming a procedural due process violation based on inability to cross-examine those witnesses. *Henderson*, 77 A.3d at 715-16; *see also Stop-N-Go*, 707 A.2d at 564 (noting that the Board's order directing a second hearing for additional evidence "did not place limitations upon [the e]mployer's right to subpoena witnesses, including [the c]laimant[.]").

Here, PPA did not appear at the June 2021 hearing where Claimant and Tribuiani, whose appearance had been secured by Claimant's subpoena, testified. C.R. at 123. PPA appealed and the Board returned the matter for a further hearing, explaining that it was doing so to allow PPA to present additional evidence (rather than in a *de novo* or *nunc pro tunc* posture): "testimony resulting from the further proceeding will be transcribed, and the *entire record* returned to the Board for its consideration and such further action as it deems appropriate." *Id*. at 157 (emphasis added). That hearing occurred in October 2021, and the referee, who advised the

10

parties that she was acting as a hearing officer for purposes of that proceeding, heard PPA's evidence and reasons for failing to attend the June 2021 hearing and on the merits. *Id*. at 193. PPA did not ensure Claimant's appearance at the October 2021 hearing by requesting a subpoena, and Claimant did not appear at the hearing. Therefore, each side had the opportunity to present evidence and testimony, but neither side had the opportunity to cross-examine the other side's witnesses. The Board considered all of the evidence and testimony and found that PPA had not established that Claimant engaged in willful misconduct such that his termination was justified; Claimant was therefore eligible for benefits. *Id*. at 193-94.

PPA argues that it sustained prejudice and a procedural due process violation because it could not cross-examine Claimant (and Tribuiani) at the June 2021 hearing. PPA's Br. at 8. PPA states that the Board should therefore not have given their testimony any weight at all and should only have considered its evidence from the October 2021 hearing. *Id*. The Board responds that the UC Law and regulations empower it to consider "the entire file and record of evidence" and that PPA had a full and fair opportunity to present its evidence at the October 2021 hearing. Board's Br. at 9-10. The Board adds that if PPA believed cross-examination of Claimant (and Tribuiani) was necessary, it should have subpoenaed them to ensure their attendance. *Id.* at 11-12.

The Board is correct. If PPA believed, as it now argues, that cross-examination of Claimant (and perhaps also Tribuiani) would have been dispositive in its favor, it had the right (and obligation) to secure their attendance by subpoena. *See* 34 Pa. Code § 101.31; *Stop-N-Go*, 707 A.2d at 564. Indeed, Claimant, acting *pro se*, took the precaution of having subpoenas issued for his own witnesses at the June 2021 hearing. C.R. at 64 & 94-99. Perhaps understandably, PPA appears to

11

have assumed that Claimant would appear at the October 2021 hearing. When he did not, PPA could have asked for a continuance in order to subpoena him; the referee/hearing officer's decision whether to allow that would have been subject to review for abuse of discretion or a constitutional violation. See *Henderson*, 77 A.3d at 713-16 (holding that hearing officer and Board did not abuse discretion or violate procedural due process in denying claimant's request for continuance in order to serve subpoenas on witnesses). PPA neither requested a subpoena of Claimant for the October 2021 hearing nor sought a continuance of that hearing in order to subpoena Claimant and ensure his presence at the October 2021 hearing. Because of that failure, PPA cannot now argue that the Board should have given Claimant's (and Tribuiani's) testimony from the June 2021 hearing no weight at all or that his procedural due process rights were violated. *Morgan*, 108 A.3d at 188; *Henderson*, 77 A.3d at 713-16; *Milewski*, slip op. at 5-6, 2013 WL 3156580, at *3.

Moreover, Section 504 of the UC Law states that when a matter is before the Board on appeal from a referee's determination, the Board "may affirm, modify, or reverse the [referee's determination] *on the basis of the evidence previously submitted in the case*, or direct the taking of additional evidence." 43 P.S. § 824 (emphasis added). The Board exercised its discretion and acted within the UC Law and its regulations by directing further proceedings before a hearing officer for additional evidence rather than a new proceeding on a *de novo* or *nunc pro tunc* basis. *Stop-N-Go*, 707 A.2d at 564; *see also Milewski*, slip op. at 5-6, 2013 WL 3156580, at *3. Therefore, the Board did not err, abuse its discretion, or commit a constitutional due process violation in considering the testimony of Claimant (and Tribuiani) when it made its final determination. *See Begovic v. Unemployment Comp. Bd. of Rev.*, 234 A.3d 921, 929 n.6 (Pa. Cmwlth. 2020).

12

## B. Whether PPA Established Claimant's Willful Misconduct

The Board's findings of fact are conclusive as long as they are supported by substantial evidence, which is defined as "such relevant evidence which a reasonable mind would accept as adequate to support a conclusion." *Morgan*, 108 A.3d at 185 (quotation marks omitted). This Court is bound "to examine the testimony in the light most favorable to the party in whose favor the Board has found, giving that party the benefit of all inferences that can logically and reasonably be drawn from the testimony" to determine if substantial evidence exists for the Board's findings. *Id.* Moreover, "even if there is contrary evidence of record, the Board's findings of fact are binding upon the Court [when] supported by substantial evidence." *Id.*

Pursuant to Section 402(e) of the UC Law, a claimant will not be eligible for benefits if his unemployment is "due to his discharge or temporary suspension from work for willful misconduct connected with his work." 43 P.S. § 802(e). Willful misconduct is defined by our courts as: "(1) wanton and willful disregard of an employer's interests; (2) deliberate violation of rules; (3) disregard of the standards of behavior which an employer can rightfully expect from an employee; or, (4) negligence showing an intentional disregard of the employer's interests or the employee's duties and obligations." *Johns v. Unemployment Comp. Bd. of Rev.*, 87 A.3d 1006, 1009-10 (Pa. Cmwlth. 2014). The employer bears the initial burden of establishing a claimant engaged in willful misconduct. *Id.* Whether a claimant's actions constitute willful misconduct is a question of law fully reviewable on appeal. *Id.*; *see also Campbell v. Unemployment Comp. Bd. of Rev.*, 694 A.2d 1167, 1169 (Pa. Cmwlth. 1997). Where, as here, the determination of willful misconduct is based on the violation of a work rule, an employer must

13

establish the existence of the rule, the reasonableness of the rule, the claimant's knowledge of the rule, and its violation. *Johns*, 87 A.3d at 1010. If the employer does so, the burden shifts to the claimant to show good cause for the rule violation or the unreasonableness of the policy. *Id.*

As noted above, willful misconduct may also be found in the absence of a rule violation if the claimant disregards the employer's interests or standards of behavior. *Johns*, 87 A.3d at 1009. In this regard, the employer's behavior standard must be obvious, and the employee's conduct must be "so inimical to the employer's best interests that discharge is a natural result." *Pierce-Boyce v. Unemployment Comp. Bd. of Rev.*, 289 A.3d 130, 136 (Pa. Cmwlth. 2022). Even if a claimant in a public-facing job engages in a confrontation with a customer, potential customer, or member of the public, if the Board resolves conflicting testimony in the claimant's favor, it is not this Court's place to reweigh the evidence:

> [the e]mployer's argument that [the claimant's] actions rose to the level of willful misconduct is premised on its preferred version of the facts, which is contrary to the facts found by the Board. . . . [The e]mployer's argument is nothing more than an invitation for this Court to re-weigh the evidence, which we cannot do in our appellate role.

*Macro Enter. v. Unemployment Comp. Bd. of Rev.*, 449 A.2d 788, 789 (Pa. Cmwlth. 1982) (upholding Board award of benefits because employer failed to establish that claimant acted with disregard of its interests despite evidence of claimant's aggressive personality and difficulty getting along with employees and customers); *see also Phila. Fresh Foods, LLC v. Unemployment Comp. Bd. of Rev.* (Pa. Cmwlth., No. 140 C.D. 2017, filed Nov. 14, 2017), slip op. at 6-7, 2017 WL 5328758, at *3 (unreported) (affirming Board's award of benefits to claimant who argued with "prospective customer" during protest outside employer's store).

14

Hearsay is "an out of court [statement] offered to prove the truth of the fact asserted [in the statement]." *Pierce-Boyce*, 289 A.3d at 137. However, testimony based on an individual's personal knowledge and observations is not hearsay. *Id*. A hearsay statement that is not objected to is still competent evidence and may form the basis for a finding of fact if it is corroborated by other competent evidence. *Id*. "[I]t is unnecessary that the finding of willful misconduct be supported by substantial evidence absent the hearsay. . . . All that is necessary is that the facts adding weight or confirming the hearsay be established by competent evidence." *Id*.

In *Socash v. Unemployment Compensation Board of Review*, 451 A.2d 1051 (Pa. Cmwlth. 1982), the claimant, a truck driver, was fired for speeding. *Id*. at 1051-52. The claimant's supervisor testified for the employer that he received a phone call from a customer directing him not to send the claimant back to the jobsite because the claimant was speeding and almost collided with another truck. *Id*. at 1052. The supervisor stated that he and the customer had previously warned the claimant on several occasions about speeding. *Id*. This Court determined that the supervisor's testimony was not hearsay, noting that while the testimony included the customer's out-of-court statements, it also included the supervisor's personal observations regarding the claimant's excessive speed, which led directly to the termination. *Id*. at 1052. Even if the supervisor's testimony was hearsay, it was admitted without objection and was corroborated by other competent evidence, specifically the claimant's own testimony that he was racing another driver and driving fast enough to kick up dust on the road. *Id*. at 1053. This Court concluded that the claimant's testimony lent "weight and credibility to the employer's hearsay account of speeding" such that the employer established that the claimant's actions

amounted to willful misconduct and that his termination was justified; therefore benefits were not warranted. *Id.*

In *Pierce-Boyce*, the claimant was driving an individual from the employer's Philadelphia therapy location to a halfway house in Altoona. 289 A.3d at 134. The employer learned that the claimant was speeding and terminated her for violating safety rules. *Id.* The employer's witness did not have personal knowledge of the claimant's speeding but related that the employer had learned of it from unadmitted GPS evidence. *Id.* at 138. The claimant did not object to the testimony and essentially admitted in her own testimony that she had been driving above the speed limit. *Id.* Relying on *Socash*, this Court concluded that the claimant's testimony sufficiently corroborated the employer's hearsay evidence and that the employer had established the claimant's willful misconduct and ineligibility for benefits. *Id.* at 138-39.

By contrast, the law has long been settled that if specific evidence is central to an employer's case for willful misconduct, the employer must either present that evidence through non-hearsay or corroborate any hearsay evidence with competent and substantial evidence; the failure to do so may result in an award of benefits. In *Kiriluk v. Unemployment Compensation Board of Review*, 389 A.2d 772 (Pa. Cmwlth. 1979), the claimant was terminated for willful misconduct after allegedly lying to the employer by asserting that an injury he sustained at home had occurred at work. *Id.* at 774. At the claimant's hearing for unemployment benefits, the claimant testified and denied the employer's allegations, while the employer failed to present any of its investigation witnesses. *Id.* This Court concluded:

> [T]he only person who testified before the referee with actual knowledge of the alleged misrepresentation was [the c]laimant. He denied all of the alleged misrepresentations. Witnesses were available to the party

16

having the burden of proof, but those witnesses were not called. The referee's findings of fact affirmed by the Board rest solely upon hearsay evidence contradicted by [the c]laimant and uncorroborated by other competent evidence.

*Id*. at 775. Although we remanded in *Kiriluk* for reasons unique to that case, we made clear that we otherwise would have awarded benefits and that, where certain testimony is "crucial" to an employer's case, the employer must present that evidence directly. *Id*.

Similarly, where an employer's assertion of willful misconduct stems from a specific incident involving the claimant and a "victim," the employer's failure to present testimony from the victim or any other eyewitness to refute the claimant's account has resulted in a conclusion that the employer's documentary evidence concerning the incident was uncorroborated hearsay, and if no other admissible evidence supported the employer's position, benefits were warranted. In *Ellis v. Unemployment Compensation Board of Review*, 425 A.2d 496 (Pa. Cmwlth. 1981), the claimant, a psychiatric aide, was terminated for allegedly abusing a patient. *Id*. at 497. The claimant testified and denied the employer's abuse allegations, while the employer's evidence consisted largely of its investigative reports concerning the incident. *Id*. at 498. This Court concluded that benefits should have been awarded because the employer's evidence relied entirely on uncorroborated hearsay:

The most striking point with respect to the evidence presented against [the c]laimant is that it is all hearsay. Neither the alleged victim nor the alleged identification witness attended either hearing. No other witnesses to the alleged incident were produced by the [e]mployer. [The employer's witness's] testimony was based on interviews with persons not present at either hearing. The [e]mployer's investigative report was based primarily upon additional interviews with persons who did not testify. Finally, none of the employees whose written

17

> statements were admitted into evidence testified. Thus, the evidence uniformly relies upon out of court statements submitted to prove the truth of the matters asserted. The evidence is clearly hearsay.

*Id*.; *see also Boliver v. Unemployment Comp. Bd. of Rev.*, 522 A.2d 688, 690-91 (Pa. Cmwlth. 1987) (relying on *Ellis* to uphold award of benefits where employer's evidence that nursing aide committed willful misconduct by abusing patient was limited to "interviews with persons not present at the hearing," including the alleged victim and witnesses to the alleged incident).

Here, the Board adopted the referee's June 2021 decision in Claimant's favor. C.R. at 123 & 193. The referee credited Claimant's testimony that he worked to the best of his ability and had not knowingly violated any PPA rules or policies. *Id*. The Board also noted that Evans had not witnessed the October 2020 incident firsthand and had only watched video of the incident without sound. *Id*. at 194. Moreover, she had not been involved in the decision to terminate Claimant. *Id*. The Board concluded that Evans's testimony was hearsay lacking any corroboration and that PPA therefore failed to meet its initial burden to establish that Claimant engaged in willful misconduct. *Id*. at 194.

PPA argues that its documentary evidence and Evans's testimony established Claimant's willful misconduct and violation of PPA's policy for patrons who have insufficient funds to pay their parking charges. PPA's Br. at 11-13. PPA adds that Evans presented and testified about Claimant's most recent performance review, which Evans personally conducted, and which included warnings to Claimant about his conduct with staff and patrons; PPA asserts that these issues manifested in the October 2020 incident. *Id*. at 14. PPA avers that this case resembles *Socash* and *Pierce-Boyce* in that Claimant did not object to Evans's testimony (because Claimant was not present at the second hearing in October 2021),

and because, according to PPA, Claimant's own testimony and evidence from the initial hearing corroborated Evans's subsequent testimony and effectively cured any hearsay defect in Evans's testimony. *Id.* at 16-18. Specifically, PPA points to Claimant's statement on his initial benefits application that his termination resulted from the October 2020 incident when he "asked a customer to pay her parking bill," the indications on his performance review that he had issues communicating with patrons, and Evans's personal observations while investigating the incident. *Id.* at 19-20. PPA concludes that if Claimant had followed the insufficient funds policy and simply handed the patron the paperwork, the incident would never have escalated as it did. *Id.* at 20.

The Board responds that PPA misstates the issue here as one of fact that can be resolved by a substantial evidence analysis, noting that there is no dispute that PPA terminated Claimant for his alleged violation of the insufficient funds policy. Rather, the Board notes that this is a question of law: whether PPA met its burden to show Claimant's willful misconduct. Board's Br. at 13 (citing *Campbell*). The Board adds that the patron's emailed complaint was hearsay and that PPA should have subpoenaed the patron to recount her experience just as Claimant, acting *pro se*, subpoenaed Tribuiani, who witnessed the incident. *Id.* at 15 & n.6. The Board avers that *Socash* and *Pierce-Boyce* do not support PPA's position here because Claimant's and Tribuiani's testimony, along with the documentary evidence, did not corroborate Evans's hearsay testimony about the incident, but actually refuted it. *Id.* at 17-23.

In the record, Claimant stated in his online benefits application that his termination resulted from an incident after he "asked a customer to pay her parking bill." C.R. at 15-16. Contrary to PPA's assertion that this statement corroborated

19

Evans's testimony, this statement does not implicate willful misconduct; as a deputy manager of the parking facility, asking a customer to pay their bill was clearly a routine part of Claimant's duties. There is also no dispute that an incident occurred over the patron's parking bill. The question is whether PPA established that Claimant violated the insufficient funds policy during the encounter, whereas Claimant's application indicated that the issue was never that the patron had insufficient funds, but that she "wanted to pay less than what she owed." *Id*. at 17. Although Claimant wrote that the patron "complained I would not allow her to leave without paying," this was not an admission either. *Id*. In his appeal, Claimant described the incident with additional details, none of which corroborated PPA's assertion that the incident arose due to the patron's lack of funds. *Id*. at 44-45. Instead, Claimant maintained that the issue was the patron's insistence on a discount that he could not give her, refusal to pay her bill, and refusal to accept Claimant's explanation or attempt to give her options for resolution. *Id*. Claimant's appeal also stated that the patron ultimately did pay her full bill, therefore insufficient funds were never the problem. *Id*. at 45.

When Claimant testified before the referee at the June 2021 hearing, he recounted the incident consistently with his written account. He averred that he had not violated any PPA rules or policies or engaged in willful misconduct. C.R. at 107-08. He related that the incident began because the patron insisted on a discount that her parking duration had not warranted. *Id*. at 107. Tribuiani, who was present during the incident, testified that Claimant's testimony was accurate, that the incident began over the patron's demand for the discount, that Claimant tried to provide the patron with payment options and explained that the charged rate could

20

not be changed, that Claimant never kept the patron from leaving, and that the patron ultimately paid the entire charge with a credit card. *Id*. at 108-10.

Although Evans testified after Claimant, her burden on behalf of PPA was primary: to establish the existence and reasonableness of the insufficient funds policy, Claimant's knowledge of the policy, and that Claimant violated the policy or disregarded PPA's interests or standards of behavior. *Johns*, 87 A.3d at 1009-10. Evans confirmed that Claimant was terminated for violating PPA's insufficient funds policy and there was no dispute that the policy was reasonable, and that Claimant was aware of it. C.R. at 183. At issue is whether Claimant violated the rule or otherwise disregarded PPA's interests or standards of behavior. Evans acknowledged that she was not present at the incident but had watched video of it without sound, that she interviewed the patron, Claimant, and Tribuiani by phone, and that she reported her findings to HR, which terminated Claimant. *Id*. at 184-85. She did not know whether a single incident was sufficient to warrant termination and that it had not happened in the past. *Id*. at 185. She stated that after her investigation, she believed the patron's version of events, including the patron's assertions that she did not have enough money to pay the parking charge and was not given insufficient funds documents to pay within five days, and that Claimant would not let her leave. *Id*. at 186 & 189.

Evans also believed that Claimant's email to her after her interview with him and another instance where he did not follow procedure for a shift absence contributed to his termination. C.R. at 187-88. Evans testified concerning Claimant's recent evaluation that indicated he had issues and prior warnings about his interactions with staff and patrons. *Id*. at 190.

21

The Board is correct that PPA did not present competent and substantial evidence to establish that Claimant knowingly violated the insufficient funds policy so as to amount to willful misconduct. Evans was not present at the incident and relied only on video without sound, as well as the patron's written complaint and Evans's interview with the patron, whom PPA did not subpoena to testify. PPA did not present the report or testimony of the airport police who responded to the incident either. Evans's testimony about the incident that led to Claimant's termination was therefore hearsay. In that regard, the testimony given by Claimant and Tribuiani was not corroborative.

By contrast, Claimant maintained consistently in his writings and testimony that the patron instigated the incident by arguing for the discount and not because she did not have enough money to pay. Claimant's testimony was supported by Tribuiani, who witnessed the incident and confirmed that Claimant tried to explain the discount and the rules, including the patron's options to pay. Tribuiani also stated that the patron ultimately paid the full amount with a credit card, which refuted PPA's position. *Socash* and *Pierce-Boyce*, where the claimants' testimony corroborated the employers' version of the facts, are therefore both distinguishable. This case more closely resembles *Kiriluk*, *Ellis*, and *Boliver*, where the employers' failures to provide non-hearsay or corroborative evidence resulted in the employers having no substantial record evidence to support their willful misconduct allegations.

PPA also failed to establish that Claimant disregarded its interests or standards of behavior. While Claimant's recent performance evaluation indicated issues with interpersonal communications and stated that this was an area for him to improve, neither that document nor Evans's testimony established that Claimant was

22

in peril of disciplinary action or termination as a result of his conduct. Although there is no dispute that Claimant argued with the patron, nothing in this record indicates that his behavior was "so inimical to the employer's best interests" that his termination was a "natural result," and we will not reweigh the evidence to reach a conclusion more favorable to PPA than the Board's. *Pierce-Boyce*, 289 A.3d at 136; *Morgan*, 108 A.3d at 185; *see also Macro Enter.*, 449 A.2d at 789; *Phila. Fresh Foods*, slip op. at 6-7, 2017 WL 5328758, at *3. The Board's determination that PPA failed to meet its burden to show that Claimant acted with willful misconduct such that he became ineligible for unemployment benefits was therefore supported by substantial evidence and did not amount to legal error. *Johns*, 87 A.3d at 1009-10; *Begovic*, 234 A.3d at 929 n.6.

### III. Conclusion

In light of the foregoing, the Board's January 11, 2023, order is affirmed.

_____
CHRISTINE FIZZANO CANNON, Judge

23

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Philadelphia Parking Authority,    :
                Petitioner    :
                            :
           v.             :
                            :
Unemployment Compensation    :
Board of Review,    :   No. 116 C.D. 2023
                Respondent    :

## O R D E R

AND NOW, this 17th day of January 2024, the January 11, 2023, order granting unemployment benefits to Terrence Arthur is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge